1
2
3
4
5
6
7
8
9          **IN THE UNITED STATES DISTRICT COURT**
10         **FOR THE EASTERN DISTRICT OF CALIFORNIA**
11
12   GREG OCCHIONERO,                          CASE NO. CV F 05-1184 LJO SMS

13                    Plaintiff,          _____**SUMMARY JUDGMENT DECISION**
                                                (Doc. 81.)
14          vs.

15   CITY OF FRESNO,

16                    Defendant.
                                          /
17   _____

18          Defendant City of Fresno ("City") seeks summary judgment on plaintiff Greg Occhionero's

19   ("Mr. Occhionero's") equal protection, First Amendment retaliation, and procedural due process claims

20   arising from the City's execution of an inspection/abatement warrant for Mr. Occhionero's recycling

21   operation and destruction of his property.  Mr. Occhionero argues that factual disputes bar summary

22   judgment of his claims.  This Court considered the City's summary judgment motion on the record,

23   pursuant to Local Rule 78-230(h).[1]  For the reasons discussed below, this Court GRANTS the City

24   summary judgment.

25   _____

26          [1]      This Court carefully reviewed and considered all arguments, points and authorities, declarations,
     depositions, exhibits, statements of undisputed facts and responses thereto, objections and other papers filed by the parties.
27   Omission of reference to an argument, document, paper or objection is not to be construed to the effect that this Court did
     not consider the argument, document, paper or objection.  This Court thoroughly reviewed and considered the evidence it
28   deemed admissible, material and appropriate for summary judgment.

                                                    1

**BACKGROUND**

**The Property**

Mr. Occhionero's parents own the Fresno commercial property at 2680 N. Miami ("property") where Mr. Occhionero conducts recycling, primarily of polyurethane foam.  Mr. Occhionero's parents submitted to the City a site plan for the recycling operations.  Mr. Occhionero has used the property rent free to store materials, including foam, carpet pads, metal, bottles, paper, plastic and cans.

**Municipal Auditing Services And Mr. Occhionero's Communications With The City**

In summer 2002, the City inquired whether Mr. Occhionero possessed a business tax certificate and utilized Municipal Auditing Services ("MAS"), an outside entity, to assist with compliance with the City's business tax ordinance.  MAS identified the property as a possible business not paying taxes.

During July 26, 2002 to October 14, 2002, MAS sent several letters to Polyurethane Foam Recyclers of America ("PFRA"), whom MAS believed utilized the property, to seek information.  Several of MAS' written communications included a letter from Leon Molina ("Mr. Molina"), Revenue Supervisor of the Utilities, Billing and Collection Division of the City's Finance Department.[2]  Mr. Molina's letter stated in pertinent part:

> Please be advised that the City of Fresno has authorized Mr. Kevin Weigant and the firm of Municipal Auditing Services (MAS) to conduct "discovery" compliance verifications with the City's Business Tax Ordinance.  The purpose of this program is to find businesses that are not paying business taxes to the City.
>
> In this regard, MAS is acting as an extension of City staff and operating under the rules and regulations of the City's Business Tax Ordinance.

In response to MAS notices, PFRA's unsigned August 30, 2002 letter[3] asked Mr. Molina to "provide proof that the City of Fresno has the right to contract a private company for Governmental use?"  The letter further stated: "I will agree to the Fresno Municipal Code on the City's Business Tax Ordinance once you provide Proof of Claim that I am no longer entitled to Article 1 of the California State Constitution."   Thereafter up to November 9, 2002, PFRA and Mr. Molina exchanged letters which Mr. Occhionero describes as "a letter writing war."  Although he did not want to engage in a

---

[2]   Mr. Occhionero describes Mr. Molina as a "City tax auditor who looks for 'non-compliant' taxpayers."

[3]   Mr. Occhionero appears to acknowledge that he is the author of PFRA's correspondence.

"paper chase," Mr. Molina's September 12, 2002 letter to PFRA stated:

> Unfortunate, though it would be interesting to discuss this philosophically inspiring subject as to taxation vs. representation ad nauseam, we do not have the time nor legal background to engage in this intriguing area during working hours.

> However, let me assure you, the City Attorney has reviewed such questions and the State of California has conferred upon the City the proprietary authority and fiduciary responsibility to collect revenues in the form of taxes and appropriate fees for services rendered.

In his October 3, 2002 e-mail to MAS, Mr. Molina noted that Mr. Occhionero "seems to be our target" regarding the property and added: "Hard copy file has letter [un-signed] by writer who is on letter campaign   does not deny being in business."

The City attributes PFRA to have taken the position that MAS exercised an unconstitutional delegation of taxing authority.  The City points to following from PFRA's unsigned November 9, 2002 letter:

> I do not believe that the government can delegate their [sic] powers to private organizations and until you can prove me wrong, you will have to do whatever is proper in this matter.  Until I have been informed fully, I will not call anyone.  Since I do not believe that MAS, as a private company, has delegated powers from the government.  I have contacted your office and you will not provide any law that specifically designates me as one who must get a license or prove MAS is properly delegated government powers.

Mr. Molina sent a November 12, 2002 e-mail to members of other City departments to alert that Mr. Occhionero, using Mr. Occhionero's words, "could be a problem."  The e-mail stated:

> Occhionero has not been cooperative what-so-ever either with Business Tax or City Utilities

> He told field rep of City utilities that "he built steel commercial building by himself" has been connected to City Water and Sewer for a long time without paying a cent

> So question is Did he get a Commercial Building Permit?  and is building rigged for fire protection?  he handles foam rubber it burns real good once it gets started

In November 2002, MAS ceased involvement with the property, and the City and PFRA ceased letters on the use of MAS.  In late 2002 or early 2003, Brian Reams, Manager of the Billing and Collection Division of the City's Finance Department, viewed the property and concluded that pursuit of business taxes against PFRA or Mr. Occhionero was not worthwhile in that the property was not a significant "income generating enterprise."

1   During summer 2003, Mr. Occhionero filed claims for damages with the City to challenge the

2   propriety of the relationship between the City and MAS.  Thereafter in 2003, Mr. Occhionero filed pro

3   se a civil action against the City in Fresno County Superior Court to seek injunctive and declaratory

4   relief as to the City's business tax actions.[4]

5   **Crippen Fire**

6   A recycler, identified by the parties only as "Crippen," stored debris on his property (unrelated

7   to Mr. Occhionero's property) and which caught fire on January 11, 2003.  By January 14, 2003, the fire

8   was out of control, and local government authorities requested California and federal authorities to assist

9   to suppress the fire.  Suppression of the fire required 30 days and more than $2 million.  The City

10  declared a local emergency which remained in effect for more than six months.  In response to the

11  Crippen fire, the City notes that it made "a critical analysis of its operations . . . to prevent such a

12  catastrophe from reoccurring" and made changes to code enforcement.  Mr. Occhionero notes that the

13  City's Conditional Use Permit "Strike Team" was formed to be "proactive" in code enforcement and "in

14  finding code violations."

15  **City Code Enforcement Citations And Mr. Occhionero's Continuing Communications**

16  After the Crippen fire, the City's Code Enforcement inspected recyclers' properties and

17  properties with "high risk land uses," including Mr. Occhionero's property.  On February 21, 2003, Israel

18  Trejo ("Mr. Trejo"), a then City Code Enforcement employee, inspected and observed throughout Mr.

19  Occhionero's property vehicle parts, scrap metal, wood, carpet pads, cardboard, and bed foam.  Mr.

20  Trejo noted that materials were stacked to the ceiling of a warehouse and that items were stored

21  inconsistently with "requirements and limitations of the site plan and in violation of the Fresno

22  Municipal Code."

23  Mr. Trejo sent a March 13, 2003 notice of violation to the property's owners, Michael and

24  Vincenza Occhionero, Mr. Occhionero's parents, for unauthorized storage of materials in the property's

25  parking area and recycling of unauthorized materials. Mr. Occhionero's March 29, 2003 unsigned letter

26  responded to the notice in part:

27

28  [4]   The parties have not informed the Court of the status or outcome of Mr. Occhionero's action.

You stated that "Staff will reinspect the property," so it appears that this has been done, and I did not see them. I feel like this is Germany, and . . . thought police are at my door. I thought World War II was to get rid of tyrants like this. Did Hitler use the Code to control his people? Or did they call it "law"?

. . .

Also, your letter said to "Call or Schedule an Appointment . . ." Since I am not a "recycling center," but a common man on his own property, and your zoning does not apply to me. I am not licensed nor do I have a permit, and inspections cannot be done without a court order. Please consider this in the future.

On May 1, 2003, Mr. Trejo reinspected the property and found the same violations that existed on February 21, 2003. Mr. Trejo sent a May 7, 2003 administrative citation addressed to Mr. Occhionero's parents. The citation noted that failure to correct violations "may result in subsequent administrative citations with increased penalties for the same violation(s); and/or further legal action."

Because violations on the property continued, Mr. Trejo sent May 23, 2003, June 12, 2003 and July 1, 2003 administrative citations to Mr. Occhionero's parents to address reduction of parking storage area and storage of used materials on the property. Mr. Occhionero and his parents neither cured the violations nor appealed the four administrative citations. In his recent declaration, Mr. Trejo states: "Code Enforcement attempted to work with Plaintiff and his parents to have them comply with the site plan and the Fresno Municipal Code. However, Plaintiff and his parents would not fully comply and would not allow me onto the Property to inspect it – in particular, the interior storage area."

Since Mr. Trejo had not responded to Mr. Occhionero's March 29, 2003 letter, Mr. Occhionero, in his June 30, 2003 letter, considered Mr. Trejo in "default":

As of this date, June 30, 2003, no default letter was not sent on the March 29, 2003 letter. Since Israel Trejo stated he had received it, and plenty of time has lapsed, this is your default notice on the March 29, 2003 letter.

In November 2003, Mr. Trejo observed from the street the same violations on the property and was denied entry on to the property.

**City Fire Department Inspections**

Mr. Trejo contacted the City Fire Department to inspect the property for fire code violations. On April 2, 2003, City Fire Department inspector Richard Fultz ("Mr. Fultz") inspected the property and found it in violation of the site plan and fire code. Specifically, Mr. Fultz noted polyurethane and high-hazard commodities stored higher than six feet in the property's warehouse with no fire aisles in a non-

5

1   sprinklered area. Mr. Fultz provided a fire inspection notice and compliance order. Mr. Fultz concluded

2   that the property was not an imminent danger. On April 17, 2003, May 27, 2003 and June 16, 2003, Mr.

3   Fultz reinspected the property from the street and noted the same violations.

4        The Fire Department received no response to its September 2, 2003 letter request for an on site

5   property inspection. Mr. Fultz conducted a November 12, 2003 driveby inspection and noted continuing

6   violations. On November 25, 2003, Mr. Fultz was denied access to inspect the property but observed

7   from the street continuing violations, including exceeding the six-foot limitation for storage materials

8   inside the property's warehouse.

9                              **Inspection/Abatement Warrant**

10       The City notes that due to Mr. Occhionero and his parents' refusal to comply with the site plan

11  and codes and to allow inspection of the property's warehouse, Code Enforcement entertained to obtain

12  a warrant in October and early November 2003. Mr. Occhionero notes that in November 2003, Mr.

13  Trejo, his supervisor Al Brajkovich, and Code Enforcement legal assistant Richard Salinas met with a

14  deputy City Attorney to address the property.

15       After Mr. Trejo and Mr. Fultz submitted supporting declarations, the Fresno County Superior

16  Court issued a November 26, 2003 inspection/abatement warrant for the property.[5] On December 8,

17  2003, Code Enforcement personnel executed the warrant. Mr. Flutz confirmed the warehouse's

18  continuing conditions of excess-height storage of hazardous materials and lack of an aisle for firefighter

19  access. In his recent declaration, Mr. Flultz opined "such conditions were an imminent threat to health

20  and safety. As a result, Code Enforcement removed and/or moved the materials to ensure that the

21  property complied with Codes and the Site Plan." Mr. Flutz and Mr. Trejo observed on the property and

22  in its warehouse cardboard, aluminum cans, car parts, carpet, furniture, polyurethane foam, scrap metal,

23  wood, solvents and bottles.

24       A City contractor was directed to abate the hazardous condition to store properly hazardous

25  materials with fire aisles. Mr. Occhionero criticizes the abatement in that: (a) the City delayed 14 days

26

27        [5]       In his declaration, Mr. Fultz opined that the property "poses a threat to the public's health and safety
    because of the difficulty of extinguishing a fire inside the nonsprinklered building with materials, particularly the polyurethane
28  foam, stacked over 6 feet in height with no maintained aisle for firefighter access."

1   to December 8, 2003 to execute the warrant; (b) the contractor drove forklifts to remove the polyurethane

2   foam although Mr. Trejo and Mr. Fultz claimed concern that forklifts were a potential ignition source;

3   (c) contractor employees smoked around the polyurethane foam; and (d) no fire truck was on standby.

**Destruction Of Mr. Occhionero's Property**

5   Although unclear from the parties' papers, the City contractor apparently seized and destroyed

6   760 cubic yards of Mr. Occhionero's new material and personal possessions.  Mr. Occhionero points to

7   Mr. Fultz's observations that there was no need to trash immediately the material and possessions and

8   that the imminent fire hazard ceased upon removal of the material and possessions from the property.

9   Mr. Occhionero notes that had the City "followed the law," his property would have been recycled, not

10  trashed.

**Abatement Costs Bill**

12  The City sent Mr. Occhionero's parents a December 31, 2003 Notice of Public Nuisance

13  Summary Abatement/Billing for $13,085.  On January 15, 2004, Mr. Occhionero's parents filed with

14  the City an appeal of the $13,085 abatement/billing.  In his April 1, 2004 decision, a City independent

15  administrative hearing officer upheld the $13,085 charges but found an absence of imminent danger to

16  justify summary abatement:

> It is hard to justify that a condition on December 8, 2003, suddenly became an imminent
> danger, justifying summary abatement, when substantially that same condition on April
> 2, April 27, and June 16 was not deemed sufficiently hazardous to warrant summary
> abatement.  Again, if this was such an imminent danger, why did the City wait from June
> until November to apply for a warrant.

20  On May 10, 2004, Mr. Occhionero's parents filed a petition for writ of administrative mandamus

21  to request the Fresno County Superior Court to overturn the $13,085 abatement/billing.  The Fresno

22  County Superior Court issued a December 28, 2004 order to set aside the $13,085 abatement/billing

23  against Mr. Occhionero's parents.

**Absence Of Communications Of MAS Complaints**

25  The City notes that no one in the City Finance Department told anyone in the City Fire

26  Department or City Code Enforcement that Mr. Occhionero or PFRA complained about delegation of

27  taxing authority to MAS or instructed to take action against Mr. Occhionero or PFRA.  The City claims

28  that "for the most part, the individuals dealing with PFRA in the Finance Department did not even know

7

1   the individuals who where dealing with Plaintiff on code enforcement and fire issues." The City further

2   claims that "prior to seeking the issuance of the inspection/abatement warrant in November/December

3   2003, no one ever contacted Reams and Molina in the Finance Department regarding this action."

### Mr. Occhionero's Claims

5       Mr. Occhionero proceeds on his third amended complaint ("TAC") to allege that the City sought

6   and executed the inspection/abatement warrant to retaliate against Mr. Occhionero's challenge to the

7   City's relationship with MAS. The TAC alleges:

8       1.      A (first) equal protection violation cause of action that under standards for a claim by a

9               "class of one," Mr. Occhionero was treated differently than other similarly-situated

10              persons in that the City carried out an aggressive a Code Enforcement campaign to

11              punish Mr. Occhionero's challenges to the propriety of the City-MAS relationship;

12      2.      A (second) First Amendment Retaliation cause of action that the City's Code

13              Enforcement actions retaliated against Mr. Occhionero's "public criticism and challenge

14              of MAS"; and

15      3.      A (third) procedural due process cause of action that the City seized and destroyed 760

16              cubic yards of Mr. Occhionero's new material and personal possessions valued in excess

17              of $70,000 without a pre- or post-deprivation hearing.[6]

18      Mr. Occhionero seeks to recover for his emotional distress, mental suffering and damage to his

19  reputation and livelihood.

20      The City seeks summary judgment that Mr. Occhionero is unable to support elements of his

21  "class of one" equal protection, First Amendment retaliation, and procedural due process claims.

### DISCUSSION

### Summary Judgment Standards

24      F.R.Civ.P. 56(b) permits a party against whom relief is sought to seek "summary judgment on

25  all or part of the claim." Summary judgment is appropriate when there exists no genuine issue as to any

26  material fact and the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c);

27

28      [6]     This Court's May 1, 2007 order dismissed the TAC's fourth cause of action for violation of the Fifth
        Amendment's Takings Clause.

8

1   *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W.*

2   *Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of

3   summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a

4   genuine need for trial." *Matsushita Elec.*, 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union*

5   *of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

6           On summary judgment, a court must decide whether there is a "genuine issue as to any material

7   fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(c); *Covey v.*

8   *Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398

9   U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct.

10  486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The

11  evidence of the party opposing summary judgment is to be believed and all reasonable inferences that

12  may be drawn from the facts before the court must be drawn in favor of the opposing party.  *Anderson*

13  *v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct.

14  1348.  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to

15  a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S.

16  at 251-252, 106 S.Ct. 2505.

17          To carry its burden of production on summary judgment, a moving party "must either produce

18  evidence negating an essential element of the nonmoving party's claim or defense or show that the

19  nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

20  persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th

21  Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir.

22  1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the

23  court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech*

24  *Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material.

25  Only disputes over facts that might affect the outcome of the suit under the governing law will properly

26  preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

27          "If a moving party fails to carry its initial burden of production, the nonmoving party has no

28  obligation to produce anything, even if the nonmoving party would have the ultimate burden of

9

persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *See Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

      As discussed below, the City demonstrates an absence of evidence or legal authority to support Mr. Occhionero's alleged constitutional deprivations or claims.

### Equal Protection

### *Free Speech Retaliation*

The gist of Mr. Occhionero's (first) "class of one" equal protection cause of action[7] is that he was treated differently because he complained that the City improperly delegated its taxing authority to MAS. The City's initial attack is that alleged retaliation based on free speech implicates the First Amendment, not the Equal Protection Clause.  The City argues that "a garden variety retaliation claim based upon free speech, such as this one, does not implicate the Equal Protection Clause."

---

[7]    In "class of one" cases, "the plaintiff does not claim to be a member of a class that the defendant discriminates against, but argues only that he is being treated arbitrarily worse than some one or ones identically situated to him." *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005).

1      "The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny

2  to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that

3  all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*,

4  473 U.S. 432, 439, 105 S.Ct. 3249 (1985).  The "purpose of the equal protection clause of the Fourteenth

5  Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary

6  discrimination, whether occasioned by express terms of a statute or by its improper execution through

7  duly constituted agents."  *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190

8  (1923).

9      Federal courts have precluded assertion of First Amendment claims as Equal Protection Claims.

10  "The claims based on the allegation that [plaintiff] was treated differently in retaliation for his speech

11  are, at their core, free-speech retaliation claims that do 'not implicate the Equal Protection Clause.'"

12  *Kirby v. City of Elizabeth City, North Carolina*, 388 F.3d 440, 447 (4th Cir. 2004) (quoting *Edwards v.

13  City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999)).  The "right to be free from retaliation may be

14  vindicated under the First Amendment . . ., but not the equal protection clause." *Boyd v. Illinois State

15  Police*, 384 F.3d 888, 898 (7th Cir. 2004); *see Vukadinovich v. Bartels*, 853 F.2d 1387, 1391-1392 (7th

16  Cir. 1988) (plaintiff's equal protection claim alleged "only that he was treated differently because he

17  exercised his right to free speech" and thus was "a mere rewording of plaintiff's First Amendment

18  retaliation claim."); *see also Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287,

19  1296, n. 8 (7th Cir. 1996) (Equal Protection Clause "does not establish a general right to be free from

20  retaliation."); *Ratliff v. Dekalb County*, 62 F.3d 338, 340-341 (11th Cir. 1995) (no clearly recognized

21  right to be free from retaliation exists under the Equal Protection Clause).

22      Mr. Occhionero ignores the City's initial attack that Mr. Occhionero attempts to construe a First

23  Amendment retaliation claim as an equal protection claim.  In the absence of viable opposition, this

24  Court agrees with other courts that a claim of different treatment in retaliation for speech is a First

25  Amendment claim which does not invoke the Equal Protection Clause.  At its core, Mr. Occhionero's

26  claim is First Amendment retaliation, not equal protection.  Without a recognized right of freedom from

27  retaliation under the Equal Protection Clause, Mr. Occhionero's (first) equal protection violation cause

28  of action fails.  Nonetheless, this Court will further address how it fails on its merits along with points

1  raised by Mr. Occhionero.

2  ### *Application Of An Olech "Claim Of One"*

3  Equal protection claims may be brought by a "'class of one,' where the plaintiff alleges that she

4  has been intentionally treated differently from others similarly situated and that there is no rational basis

5  for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073

6  (2000) ("*Olech*"). The City argues that courts have not recognized a claim under *Olech*, 528 U.S. 562,

7  120 S.Ct. 1073, arising from execution of a court-issued warrant. The City points to following from

8  *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210-1211 (10th Cir. 2004):

> In the wake of *Olech*, the lower courts have struggled to define the contours of class-of-one cases. All have recognized that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.

16  *See Lauth*, 424 F.3d at 633 ("If that is the law and any unexplained or unjustified disparity in treatment

17  by public officials is therefore to be deemed a prima facie denial of equal protection, endless vistas of

18  federal liability are opened.")

19  The City also points to the U.S. Supreme Court's recent observation in *Engquist v. Oregon Dept.*

20  *of Ag.*, __ U.S. __, 170 L.Ed.2d 975, 987, 2008 U.S. Lexis 4705, 21 (2008):

> There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenged based on arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

26  The City urges restraint to read *Olech* "too broadly and transforming federal courts into second-

27  guessers of the reasonableness of local decision making." This Court heeds the warning of the Tenth

28  Circuit Court of Appeals in *Jennings* and the U.S. Supreme Court's observation in *Engquist* as to

12

1   undermining discretion.  This Court will not legislate a class-of-one equal protection claim under the

2   guise of a First Amendment retaliation claim to permit second guessing of the City's code enforcement

3   measures at issue here.  Mr. Occhionero fails to justify – factually or legally – that this Court is suited

4   to judge the reasonableness of the City's actions regarding the property.

5                          ***Olech "Claim Of One" Elements***

6          The City also attacks Mr. Occhionero's equal protection claim for failure to satisfy *Olech*

7   elements.  To succeed on a "class of one" equal protection claim, a plaintiff bears the burden to prove

8   that: (1) he/she has been intentionally treated differently than others; and (2) there is no rational basis

9   for the difference in treatment.  *Thorton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005);

10  *Seariver Mar. Fin. Holdings Inc. v. Mineta*, 309 F.3d 662, 679 (9th Cir. 2002).

11                          <u>Similarity Requirement</u>

12         As to the different treatment element, a plaintiff must demonstrate that "the level of similarity

13  between plaintiff and the persons with whom they compare themselves must be extremely high."

14  *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2nd Cir. 2005).  To succeed, plaintiffs "must demonstrate that

15  they were treated differently than someone who is *prima facie* identical in all relevant respects."  *Purze*

16  *v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002).  The similarity requirement requires

17  a plaintiff to show:

18         (i) no rational person could regard the circumstances of the plaintiff to differ from those
           of a comparator to a degree that would justify the differential treatment on the basis of
19         a legitimate government policy; and (ii) the similarity in circumstances and difference
           in treatment are sufficient to exclude the possibility that the defendant acted on the basis
20         of mistake.

21  *Neilson*, 409 F.3d at 105; *see Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) (plaintiff "must

22  show that the parties with whom he seeks to be compared have engaged in the same activity vis-a-vis

23  the government entity without such distinguishing or mitigating circumstances would render the

24  comparison in utile.")

25         The City argues that Mr. Occhionero "has not come close to establishing that the comparators

26  are prima facie identical in all material respects."  The City notes that Mr. Occhionero's discovery

27  responses identify no "single individual who was similarly situated to him."  As to the City's

28  interrogatory to identify similarly situated persons, Mr. Occhionero responded:

To the extent the phrase refers to a specific location, plaintiff responds no one. However, if the phrase refers to interaction with the city plaintiff responds that Plaintiff is informed and believes and thereon alleges that there are other persons, places and businesses in the City of Fresno that have had dealings with MAS, Code Enforcement and other city departments that were similar to or in the same vein as the experiences that plaintiff has had. However, plaintiff has not completed discovery and is unable to provide a list of names.

In his deposition, Mr. Occhionero fared no better:

Q.   Speaking of which, Mr. Occhionero, you indicated . . . you were going to identify for me other individuals that you believe do exactly what you do that are not businesses, and I'm here to listen to what those names of those individuals are.

A.   I did not bring those names with me.

Q.   Okay. So you didn't locate any names at this point?

A.   No.

The City argues that required similarities of other comparators include:

1.   Making complaints about the City's use of MAS;

2.   Use of property in the City in violation of a site plan and applicable codes;

3.   Violations known by Code Enforcement;

4.   Refusal to rectify violations despite repeated opportunities to do so; and

5.   City's determination of imminent threat to health and safety based on property condition.

The City concludes that "no logical reason exits to presume that any person had the same characteristics as Plaintiff."

Mr. Occhionero responds that the "relevant class . . . is all recyclers and other similar businesses that, following the Crippen fire, the City fire department and code enforcement listed for inspection and enforcement." Mr. Occhionero continues that since "a reasonable jury could find that plaintiff suffered disparate treatment from City officials, he has met his burden here."

Mr. Occhionero casts a broad net to attempt to establish similarity. Mr. Occhionero in essence points to other recyclers which the City targeted as "high risk." The issue is not recycling or land use. The issue is speaking out on City practices or policies, and in this case, Mr. Occhionero voiced his displeasure of the City's use of MAS to identify businesses not paying City taxes. Mr. Occhionero points to no one who criticized the City let alone its use of MAS or other tax practices. Mr. Occhionero comes no where close to meet the similarity requirement.

14

1

Rational Basis

2      To prevail on the rational basis element, a "class of one" plaintiff must "negative any reasonably

3  conceivable state of facts that could provide a rational basis for the classification." *Lauth*, 424 F.3d at

4  634 (quoting *Board of Trustees v. Garrett*, 531 U.S. 356, 367, 121 S.Ct. 955 (2001)).  The "rational-

5  basis inquiry is a very lenient one, and specifically 'attach[es no] legal significance to the timing' of

6  legislative or municipal action." *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1156 (9th Cir. 2004)

7  (quoting *Bannum, Inc. v. City of Fort Lauderdale*, 157 F.3d 819, 822, n. 3 (11th Cir. 1998)).

8  "Governmental action only fails rational basis scrutiny if no sound reason for the action can be

9  hypothesized." *Garrett*, 531 U.S. at 367, 121 S.Ct. 955.

10      In *Bizzarro v. Miranda*, 394 F.3d 82, 88-89 (2nd Cir. 2005), the Second Circuit Court of Appeals

11  explained:

12          The pertinent question in a constitutional claim is not whether the defendants correctly
           understood the rules they were enforcing.  *Olech* does not empower federal courts to
13          review government actions for correctness. Rather, an *Olech*-type equal protection claim
           focuses on whether the official's conduct was rationally related to the accomplishment
14          of the work of their agency.

15  A decision "can be considered irrational" only when the decision-maker "acts with no legitimate reason

16  for its decision." *Harlen v. Associates v. Incorporate Village of Mineola*, 273 F.3d 494, 500 (2nd Cir.

17  2001) (quotation marks and citation omitted).  "[D]ecisions that are imprudent, ill-advised, or even

18  incorrect may still be rational." *Rossi v. West Haven Bd. of Ed.*, 359 F.Supp.2d 178, 183 (D. Conn.

19  2005).

20      The City contends that it rationally pursued the inspection/abatement warrant and abatement

21  costs of Mr. Occhionero's property to address fire safety in wake of the Crippen fire.  To support its

22  actions, the City notes that Mr. Occhionero refused to "rectify the violations" and to allow inspections

23  of the property and "never complied, despite repeated requests, with the site plan and codes."  The City

24  further bolsters its actions in that the Fresno County Superior Court found "the requisite showing had

25  been met" to issue the inspection/abatement warrant, the execution of which revealed continuing

26  violations. The City argues it properly assessed abatement costs "to protect itself against the expenditure

27  of extraordinary emergency expenses."  The City points to its ordinances to remove and eliminate

28  imminent dangers and to recover summary abatement costs.

15

Mr. Occhionero argues that the Crippen fire is not rationally connected to the property's abatement.  Mr. Occhionero contends that the City is collaterally estopped by the Fresno County Superior Court's December 28, 2004 order to set aside the $13,085 abatement/billing against Mr. Occhionero's parents.

"Collateral estoppel precludes relitigation of issues argued in prior proceedings."  *Lucido v. Superior Court*, 51 Cal.3d 335, 341, 272 Cal.Rptr. 767, 769 (1990), *cert. denied*, 500 U.S. 920, 111 S.Ct. 2021 (1990).  Under collateral estoppel or the "issue preclusion" effect of res judicata, a party is barred from raising an issue of fact or law if the issue was actually litigated and determined by a valid and final judgment in a previous proceeding, and the determination was essential to the judgment; the determination, in that instance, is conclusive in a subsequent action between the parties.  *Arakalian Farms, Inc. v. Agricultural Labor Relations Board*, 49 Cal.3d 1279, 1289-1290, 265 Cal.Rptr. 162, 168 (1989). "[E]specially where collateral estoppel is applied 'offensively' to preclude a defendant from relitigating an issue the defendant previously litigated and lost, the courts consider whether the party against whom the earlier decision is asserted had a 'full and fair' opportunity to litigate the issue." *Roos v. Red,* 130 Cal.App.4th 870, 880, 30 Cal.Rptr.3d 446 (2005), *cert. denied*, 546 U.S. 1174, 126 S.Ct. 1341 (2006).

Collateral estoppel applies to the section 1983 context in that there is "no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court." *Allen v. McCurry*, 449 U.S. 90, 104, 101 S.Ct. 411 (1980).  "A party's ability to relitigate an issue decided in a prior state court determination depends on the law of the state in which the earlier litigation occurred." *Kinslow v. Ratzlaff*, 158 F.3d 1104, 1105 (10th Cir. 1998).

The party asserting collateral estoppel bears the burden to prove the doctrine's requirements. *First N.B.S. Corp. v. Gabrielsen*, 179 Cal.App.3d 1189, 1194, 225 Cal.Rptr. 254, 256 (1989).  Threshold requirements to apply collateral estoppel are:

1.  The issue sought to be precluded from relitigation must be **identical** to that decided in a former proceeding;

2.  The issue must have been **actually litigated** in the former proceeding;

3.  The issue must have been **necessarily decided** in the former proceeding;

1       4.    The decision in the former proceeding must be **final and on the merits**; and

2       5.    The party against whom preclusion is sought must be the **same as, or in privity with**,

3          the party to the former proceeding.

4   *Lucido*, 51 Cal.3d at 341, 272 Cal.Rptr.2d at 769.

5       Mr. Occhionero does not address meaningfully the collateral estoppel elements. Mr. Occhionero

6   generalizes that the City is collaterally estopped due to the City's involvement in this action and the

7   abatement/billing action and the favorable result to Mr. Occhionero's parents in the abatement/billing

8   action. Viewed most favorably to Mr. Occhionero, the abatement/billing action determined an absence

9   of imminent danger for summary abatement. The abatement/billing action did not address the lynch pin

10  issue here – whether the City retaliated against Mr. Occhionero for his free speech. As noted above, Mr.

11  Occhionero's First Amendment retaliation claim dressed up as an equal protection claim is unavailing

12  despite application of collateral estoppel to the imminent danger issue. Moreover, whether Crippen or

13  other fire issues are connected to the City's action is immaterial given the essence of Mr. Occhionero's

14  claims as First Amendment retaliation. Nonetheless, Mr. Occhionero raises neither factual nor legal

15  issues that the City's abatement actions were irrational or illegitimate under lenient inquiry, especially

16  given that the Fresno County Superior Court issued the inspection/abatement warrant.

17      Even considered on its merits, Mr. Occhionero's (first) class-of-one equal protection cause of

18  action fails.

19                   **First Amendment Retaliation**

20      The City contends that Mr. Occhionero's (second) First Amendment retaliation claim is barred

21  in that Mr. Occhionero cannot establish that the City's alleged adverse action was substantially

22  motivated to respond to his exercise of First Amendment rights.

23      The First Amendment prohibits "direct limits on individual speech" and "adverse governmental

24  action against an individual in retaliation for the exercise of protected speech activities." *Keenan v.*

25  *Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)); *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1994). To

26  establish "a First Amendment retaliation claim against an ordinary citizen," a plaintiff must show that:

27      1.    He/she was engaged in constitutionally protected activity;

28      2.    Defendant's action caused plaintiff to suffer an injury that would chill a person of

1     ordinary firmness from continuing to engage in that activity; and

2        3.    Defendant's adverse actions were substantially motivated against plaintiff's exercise of

3              constitutionally protected conduct.

4  *Keenan*, 290 F.3d at 258; *see Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283,

5  1300 (9th Cir. 1999) (proper inquiry is whether government actions would chill or silence a person of

6  ordinary firmness from future First Amendment activities); *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th

7  Cir. 1994) (plaintiff must show that "by his actions [defendant] deterred or chilled [plaintiff's] political

8  speech and such deterrence was a substantial or motivating factor in [defendant's] conduct.") Intent to

9  inhibit speech can be demonstrated through direct or circumstantial evidence.    *Mendocino*

10 *Environmental*, 192 F.3d at 1300-1301.

11        The City's challenge focuses on the substantial motivation/intent element, that is, "whether the

12 decision to seek the warrant in November/December 2003 and abatement costs was substantially

13 motivated by letters challenging the City's ability to contract with MAS to assist in the City's efforts to

14 collect business tax revenues."[8]  The City points to an absence of evidence that City decision makers

15 concerning the inspection/abatement warrant knew of PFRA's challenge to use MAS to pursue business

16 taxes.  The City argues that Mr. Occhionero "has not produced a scintilla of evidence" the Finance

17 Department "even knew the decisionmakers in Code Enforcement or ever conveyed any information to

18 them concerning Plaintiff."  The City concludes that since "the decision makers were unaware of the

19 First Amendment activity, the speech could not have caused the action."

20        The "primary focus" is not on any possible animus directed at the plaintiff; rather, it is more

21 specific, such as an intent to deter public comment on a specific issue of public importance.

22 *Crawford-El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 1594 (1998).  A plaintiff "must provide more than

23 'mere evidence' that the defendants were aware of [plaintiff's] expressive conduct in order to establish

24 a genuine material dispute as to whether retaliation was a substantial or motivating factor for their

25 conduct." *Alpha Energy Savers v. Hansen,* 381 F.3d 917, 929 (9th Cir. 2004), *cert. denied*, 544 U.S. 975,

26 125 S.Ct. 1838 (2005).  Allegedly protected speech cannot be proven to motivate retaliation, if there is

27

28     [8]    The City notes correctly that this Court's March 3, 2006 order precludes pre-September 16, 2003 claims
       as time barred.

no evidence that the defendant knew of the protected speech. *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir.1992); *see also Caldwell v. City of Elwood, Indiana*, 959 F.2d 670, 672 (7th Cir.1992) (affirming district court's grant of motion to dismiss because plaintiff failed to plead that defendants knew of protected speech).

As to a defendant's substantial motivation, a plaintiff must establish: (1) proximity in time between plaintiff's expressive conduct and the allegedly retaliatory actions; (2) defendant's express opposition to his/her speech, either to him or to others; or (3) falsity or pretext of defendant's proffered explanations for adverse action. *Alpha Energy Savers*, 381 F.3d at 929; *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003).

The City argues that a question whether the City's Code Enforcement or Fire Department knew of PFRA's actions regarding MAS does not salvage Mr. Occhionero's First Amendment retaliation claim. *See Erickson v. Pierce County*, 960 F.2d 801, 805 (9th Cir. 1992) (employer's knowledge of employee's political activity "simply does not support [employee's] claim that her [political activity] was a substantial or motivating factor in [employer's] decision to terminate her"); *Gillette v. Delmore*, 886 F.2d 1194, 1198-1199 (9th Cir. 1989) (employee's evidence that employer "knew of his political activities" is "not sufficient to meet his burden in opposing summary judgment" in that he has "shown no link between these events and his termination"); *see also Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 751 (9th Cir. 2001).

To attempt to salvage his First Amendment retaliation claim, Mr. Occhionero notes that:

1.  Mr. Trejo and others in Code Enforcement "knew of plaintiff's speech";

2.  Mr. Molina was motivated to "turn up the heat" on Mr. Occhionero it that his November 12, 2002 e-mail ("foam rubber burns real good once it gets started") "strongly suggests an intent to prompt Code Enforcement and the Fire Department into getting involved in plaintiff's case"; and

3.  "[T]here was talk within Code Enforcement that plaintiff was making trouble for Finance."

Viewed most favorably to Mr. Occhionero, the evidence relied upon by Mr. Occhionero is speculative that the City was substantially motivated against Mr. Occhionero's exercise of

19

constitutionally protected conduct.  Mr. Molina's unestablished animus against Mr. Occhionero is immaterial.  Code Enforcement and the Fire Department's awareness, if any, of Mr. Occhionero's MAS displeasure is not determinative.  The key is whether Code Enforcement and the Fire Department acted adversely against Mr. Occhionero due to his MAS comments.  There is no evidence – direct or circumstantial – to that effect.  The evidence reveals that Code Enforcement and Fire Department actions were motivated by fire protection and safety concerns, especially given Mr. Occhionero's failure to comply with citations and inspection requests.  Mr. Occhionero offers nothing to suggest that a City employee or representative expressly opposed Mr. Occhionero's views.  Mr. Occhionero provides no evidence of falsity or pretext of the City's proffered explanations for property inspection and abatement, especially given that a Fresno County Superior issued the inspection/abatement warrant.

**Procedural Due Process**

The City contends that Mr. Occhionero's (third) procedural due process claim fails in the absence of evidence that Code Enforcement failed to provide Mr. Occhionero a pre-abatement hearing as a direct result of his complaints regarding MAS.  The City argues that similar to the First Amendment retaliation claim, there is no causal nexus between Mr. Occhionero's complaints and the City's abatement.

"The Fourteenth Amendment to the United States Constitution places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." *Coleman v. Dept. of Personnel Admin*. 52 Cal.3d 1102, 1112, 278 Cal.Rptr. 346 (1991).  Property interests that are subject to due process protections are not created by the federal Constitution. *Bostean v. Los Angeles Unified School Dist.*, 63 Cal.App.4th 95, 108-109, 73 Cal.Rptr.2d 523 (1998).  Such property interests are created, and their dimensions are defined by existing rules or understandings that stem from an independent source, such as state law. *Bostean*, 63 Cal.App.4th at 108-109, 73 Cal.Rptr.2d 523.

Once it is determine that the Due Process Clause applies, "the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600 (1972).  An essential principle of due process is that deprivation of life, liberty or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652 (1950).  "The fundamental requirement of due process is the opportunity to be

1   heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96

2   S.Ct. 893 (1976). Where a meaningful pre-deprivation hearing is practicable, post-deprivation remedies

3   do not provide due process. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct. 1148, 1158

4   (1982).

5        Mr. Occhionero does not oppose meaningfully preclusion of his (third) procedural due process

6   cause of action. The City correctly notes that Mr. Occhionero fails "to establish a causal nexus between

7   Code Enforcement's decision not to provide Plaintiff with a hearing prior to abating his Property and

8   Plaintiff's complaint to the Finance Department regarding use of MAS." Mr. Occhionero's (third)

9   procedural due process cause of action fails.

10                              ***Monell* Liability**

11        The City argues that even if Mr. Occhionero establishes a constitutional violation, the City is not

12   subject to *Monell* liability in the absence of a municipal policy or custom to cause his alleged injury.

13        A local government unit may not be held liable for the acts of its employees under a respondeat

14   superior theory. *Monell v. Department of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018 (1978);

15   *Davis v. Mason County*, 927 F.2d 1473, 1480 (9th Cir.), *cert. denied*, 502 U.S. 899, 112 S.Ct. 275 (1991);

16   *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989). "[A] municipality cannot be held

17   liable *solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2018. The local

18   government unit "itself must cause the constitutional deprivation." *Gilette v. Delmore*, 979 F.2d 1342,

19   1346 (9th Cir. 1992), *cert. denied*, 510 U.S. 932, 114 S.Ct. 345 (1993).

20        Because liability of a local governmental unit must rest on its actions, not the actions of its

21   employees, a plaintiff must go beyond the respondeat superior theory and demonstrate that the alleged

22   constitutional violation was the product of a policy or custom of the local governmental unit. *City of*

23   *Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197 (1989); *Pembaur v. City of Cincinnati*, 475

24   U.S. 469, 478-480, 106 S.Ct. 1292 (1986). To maintain a section 1983 claim against a local

25   government, a plaintiff must establish the requisite culpability (a "policy or custom" attributable to

26   municipal policymakers) and the requisite causation (the policy or custom as the "moving force" behind

27   the constitutional deprivation). *Monell*, 436 U.S. at 691-694, 98 S.Ct. 2018; *Gable v. City of Chicago*,

28   296 F.3d 531, 537 (7th Cir. 2002).

1   A plaintiff can establish a "policy or custom" by showing: (1) an express policy that, when

2   enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by

3   written law or express municipal policy, is so permanent and well settled as to constitute a custom or

4   usage with force of law; or (3) an allegation that the constitutional injury was caused by a person with

5   final policymaking authority. *Gable*, 296 F.3d at 537; *Baxter v. Vigo County School Corp.*, 26 F.3d 728,

6   735 (7th Cir. 1994). "The existence of a policy, without more, is insufficient to trigger local government

7   liability under section 1983." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992). "[O]fficial policy

8   must be 'the moving force of the constitutional violation' in order to establish the liability of a

9   government body under § 1983." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445 (1981)

10   (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. 2018)); *see Rizzo v. Goode*, 423 U.S. 362, 370-377, 96 S.Ct.

11   598 (1976) (general allegation of administrative negligence fails to state a constitutional claim

12   cognizable under section 1983). A "plaintiff must show that the municipal action was taken with the

13   requisite degree of culpability and must demonstrate a direct causal link between the municipal action

14   and the deprivation of federal rights." *Bryan County Commissioners v. Brown*, 520 U.S. 397, 404, 117

15   S.Ct. 1382 (1997). A plaintiff must demonstrate that a defendant's policy was "closely related to the

16   ultimate injury." *Harris*, 489 U.S. at 391, 109 S.Ct. at 1206.

17   "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under

18   *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional

19   municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence

20   of the unconstitutional policy, and its origin, must be separately proved." *City of Oklahoma City v.

21   Tuttle*, 471 U.S. 808, 823-824, 105 S.Ct. 2427, 2436 (1985).

22   The City notes that Mr. Trejo, a Code Enforcement inspector, and other members of his division

23   made the decision to seek the inspection/abatement warrant. The City points out that Mr. Trejo made

24   the decision to employ a contractor to remove materials from the property and to seek abatement costs.

25   As such, the City concludes that Mr. Trejo and those who assisted his decisions are not final

26   policymakers to subject the City to *Monell* liability.

27   Mr. Occhionero provides nothing to support that Mr. Trejo and other involved City employees

28   were final policymakers. Mr. Occhionero points out that under the Fresno Municipal Code, the Code

1   Enforcement director may seek issuance of an abatement warrant to render the director as "the highest

2   ranking city official with discretionary power over abatement warrants.  As such, that official makes city

3   policy each time he or she decides whether or not to seek an abatement warrant."

4       Viewing the evidence in his favor, Mr. Occhionero fails to demonstrate that his constitutional

5   claims arise from a City policy or custom.  The essence of his claim is that the City retaliated against his

6   comments on MAS and took irrational abatement action.  Mr. Occhionero relies on the one-time

7   issuance and execution of the inspection/abatement warrant.  Mr. Occhionero points to neither an

8   express policy nor a widespread practice to retaliate for criticism of or comment on City practices.  Mr.

9   Occhionero does not satisfy the critical element of a *Monell* claim – existence of a policy or custom.

10      Mr. Occhionero appears to rest his *Monell* claim on constitutional injury caused by a

11  policymaker.  Without factual support or merit, Mr. Occhionero  attempts to stretch the Code

12  Enforcement director into a policymaker.  Mr. Occhionero raises no factual issue that policymakers

13  sought and executed the inspection/abatement warrant.  The City correctly points to an absence of

14  evidence that a policymaker was aware of Mr. Occhionero's comments or that a policymaker ratified

15  adverse action as to Mr. Occhionero based on his speech.   Mr. Occhionero speculates that since

16  employees from multiple City departments were involved, "a jury could conclude City policy making

17  officials had to have known about the actions taken against plaintiff."  Mr. Trejo and Mr. Fultz' working

18  with other City representatives, including a deputy City attorney, does not translate into constitutional

19  injury caused by a person with final policymaking authority.  Even if a policymaker was aware of the

20  property inspection/abatement, Mr. Occhionero fails to explain how such knowledge caused his alleged

21  constitutional injury.

22      As a last ditch effort at a *Monell* claim, Mr. Occhionero argues that there is a factual issue

23  whether "the City failed to properly train Israel Trejo in the constitutional rights of persons with whom

24  he comes into contact in his work."  Mr. Occhionero points to an absence of training "on the importance

25  of protecting constitutional rights" to demonstrate "deliberate indifference to the almost certain

26  possibility that the rights violations that occurred here, in fact, would happen."

27      "[A] local governmental entity may be liable if it has a 'policy of inaction and such inaction

28  amounts to a failure to protect constitutional rights.'"  *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9[th]

1    Cir. 2001) (quoting *Oviatt*, 954 F.2d at 1474).  A local government entity may be liable under section

2    1983 "if its deliberate policy caused the constitutional violation alleged." *Blankenhorn v. City of*

3    *Orange*, 485 F.3d 463, 484 (9th Cir. 2007).  As to failure to train employees, the Ninth Circuit Court of

4    Appeals has explained:

5            The custom or policy of inaction, however, must be the result of a "conscious," . . . or
         "'deliberate choice to follow a course of action . . . made from among various
6        alternatives by the official or officials responsible for establishing final policy with
         respect to the subject matter in question.'" . . .

7

8            A local governmental entity's failure to train its employees can also create § 1983
         liability where the failure to train "amounts to deliberate indifference to the rights of
9        persons" with whom those employees are likely to come into contact. . . . "[F]or liability
         to attach in this circumstance the identified deficiency in a [local governmental entity's]
10       training program must be closely related to the ultimate injury." . . .  In other words, a
         plaintiff must show that his or her constitutional "injury would have been avoided" had
11       the governmental entity properly trained its employees. . . .

12   *Lee*, 250 F.3d at 681 (citations omitted.)

13           As a starting point and as explained above, Mr. Occhionero has failed to raise a factual issue of

14   alleged constitutional injury.  Without a constitutional injury, Mr. Trejo's training, or lack thereof, is

15   immaterial.  Nonetheless, Mr. Occhionero points to no meaningful evidence of a custom or policy of

16   inaction to train Code Enforcement employees, including Mr. Trejo.  There is nothing in the record to

17   address meaningfully official policy on code enforcement training, let alone failure to train amounting

18   to deliberate indifference to constitutional rights.  Moreover, there is no evidence of a causal link

19   between failure to train and alleged constitutional injury.

20           In sum, Mr. Occhionero fails to raise a factual or legal issue to maintain a *Monell* claim.

21                                    **CONCLUSION AND ORDER**

22           For the reasons discussed above, this Court:

23   1.       GRANTS defendant City of Fresno summary judgment; and

24   2.       DIRECTS the clerk to close this action and to enter judgment in favor of defendant City

25            of Fresno and against plaintiff Greg Occhionero.

26           IT IS SO ORDERED.

27   Dated:   **July 2, 2008**                          /s/ Lawrence J. O'Neill
                                              UNITED STATES DISTRICT JUDGE
28